# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 13-582-01** |
| | : | |
| **LEON LITTLE** | : | |
| Defendant. | : | |
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 13-582-02** |
| | : | |
| **COLISE HARMON** | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

**Rufe, J.**                                                                                    **July 9, 2018**

At the end of an 18-day trial, a jury convicted Defendants Leon Little and Colise Harmon of conspiracy to distribute oxycodone and alprazolam, and related substantive offenses. Little moves for a judgment of acquittal or, in the alternative, a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33 with respect to all fifty counts on which he was convicted. Harmon moves for acquittal or a new trial with respect to the conspiracy count only. For the reasons that follow, the motions will be denied.

## I.       BACKGROUND

In November of 2011, agents from the Drug Enforcement Administration ("DEA") noticed a greater-than-60-fold increase since 2009 in orders of oxycodone products from a small drugstore in downtown Philadelphia, Philly Pharmacy.[1] After further investigation, DEA agents

---

[1] November 30, 2018 Trial Testimony of Agent Jeffrey Lauriha (Doc. No. 371) at 112-13. Specifically, orders for oxycodone products increased from approximately 27,000 dosage units in 2009 to over 1.7 million dosage units in 2011.

observed that a large number of the prescriptions filled at the pharmacy came from Dr. Laurence Browne, a physician with a small medical office in suburban Philadelphia, and that multiple prescriptions for oxycodone products from Dr. Browne's office were being filled sequentially, indicating that patients from the office arrived at the pharmacy together.[2]  Video surveillance at Philly Pharmacy showed groups of patients arriving and departing via a GMC Yukon Denali nearly on a daily basis.[3]  Subsequent GPS tracking of the vehicle showed that it traveled routinely between Dr. Browne's office, the pharmacy, and the Raymond Rosen Projects,[4] an affordable housing community in North Philadelphia.[5]  A review of the DEA's prescription monitoring program database showed that two other local pharmacies, Northeast Pharmacy and Pharmacy of America, also had filled oxycodone prescriptions from Dr. Browne's office, and that patients had presented duplicate prescriptions for the same medications on the same day at more than one pharmacy.[6]  Based on additional investigation, the Government interviewed and later charged over 60 individuals in connection with a scheme in which "pseudo-patients" were recruited and paid to obtain and fill prescriptions for oxycodone and other drugs, which were then collected for illicit drug sales.  The majority of these defendants entered into plea agreements with the Government, pursuant to which they agreed to act as cooperating witnesses against others in the scheme.

Most of these cooperating witnesses had served as pseudo-patients, and many of them identified Defendant Little as the leader of the drug scheme and Defendant Harmon as a key player.  Two of these witnesses, James Alexander and John Baldwin, admitted to recruiting

---

[2] *Id.* at 116-19.

[3] *Id.* at 124-27.

[4] The community is currently named the Raymond Rosen Manor.

[5] *Id.* at 129-33.

[6] *Id.* at 122-24.

additional patients to the scheme and acting as "drivers" by transporting patients and pills at Little's request. Alexander, Baldwin, and others identified Harmon as another driver who handled patients, pills, and money for the scheme. Among other witnesses, the Government also obtained testimony from Heather Herzstein, the receptionist at Dr. Browne's office who admitted to scheduling appointments for pseudo-patients in exchange for cash payments from Little; Brendin Strand, a Delaware-based drug dealer who admitted to purchasing and re-selling oxycodone pills from Little; and Aminah Shabazz, Little's romantic and business partner, who described multiple financial transactions she executed in support of the couple's plan to open a United Postal Service ("UPS") franchise using cash from the pill scheme.

Little and Harmon were first indicted by a federal grand jury on October 23, 2013 for conspiracy to distribute oxycodone and alprazolam, and related charges. The Third Superseding Indictment charged Little with one count of conspiracy to distribute oxycodone and alprazolam (a controlled anxiolytic substance sold under the brand name Xanax) between June 2010 and August 2012 in violation of 21 U.S.C. § 846 (Count 1); 24 counts of distributing, and aiding and abetting distribution of, oxycodone in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Counts 2-10, 16-30); nine counts of acquiring, and aiding and abetting in acquiring, oxycodone by fraud using forged prescriptions in violation of 21 U.S.C. §§ 843(a)(3) and 18 U.S.C. § 2 (Counts 11-15, 31-34); one count of engaging in an unlawful monetary transaction by purchasing a motorcycle using illegal drug proceeds in violation of 18 U.S.C. §§ 1957 and 2 (Count 35); and 15 counts of money laundering, and aiding and abetting and willfully causing money laundering, in connection with the transfer of illegal drug proceeds into multiple third party bank accounts in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts 36-50).[7]

---

[7] Third Superseding Indictment (Doc. No. 211).

Harmon was charged with one count of conspiracy to distribute oxycodone and alprazolam (Count 1), 15 counts of distributing oxycodone, and aiding and abetting (Counts 16-30), and four counts of acquiring oxycodone by fraud, and aiding and abetting (Counts 31-34).[8]

Defendants' jury trial began on November 29, 2016. Over the course of 13 days, the Government introduced testimony from more than two dozen witnesses, including Alexander, Baldwin, other pseudo-patients, Herzstein, Strand, Shabazz, relatives and friends of Shabazz who participated in the money laundering transactions, Little's ex-wife, the former owner of Northeast Pharmacy, an employee at a motorcycle dealer in Bensalem, Pennsylvania, a former vice president at the Sugar House Casino frequented by Little, agents from the DEA and Internal Revenue Service ("IRS"), and local law enforcement officers. The Government also presented more than 200 exhibits, including call logs and recordings, surveillance footage and pictures, GPS location data, prescription records, patient files, appointment books, sales records, records of financial transactions, and other documents. Both Defendants were represented by experienced counsel, who consistently challenged the credibility of the Government's witnesses during cross examination. On December 22, 2016, the jury returned a guilty verdict on all counts charged as to each Defendant.[9]

Little filed a post-trial motion for acquittal, asserting that the evidence at trial was insufficient to support his conviction on any counts. Harmon filed a motion for acquittal or a new trial based on insufficiency of the evidence solely with respect to the conspiracy count. The Government responded to both motions, and Defendants were permitted to submit supplemental briefing. Little filed a supplemental motion for acquittal, and added a request for a new trial. Harmon also filed a supplemental motion limited to the conspiracy count. The Government

---

[8] *Id.*

[9] Jury Verdict Form (Doc. No. 304).

responded to the supplemental motions, and Harmon filed a reply.

## II.    STANDARD OF REVIEW

### A.  Federal Rule of Criminal Procedure 29

A motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure may only be granted where the evidence is insufficient to sustain the conviction.[10] The Court must determine whether the Government has adduced "substantial evidence to support the jury's guilty verdict."[11]  In ruling on such a motion, a court may not weigh the evidence, nor may it make credibility determinations, which are within the domain of the jury.[12]  Rather, the Court must consider the evidence in the light most favorable to the Government, draw all reasonable inferences in favor of the Government, and "presume that the jury properly evaluated credibility of witnesses, found the facts, and drew rational inferences."[13]  "[T]he fact that alternative inferences exist is irrelevant."[14]  "The prosecution may satisfy its burden entirely through circumstantial evidence."[15]  Viewing the evidence in its entirety, the verdict must be upheld unless "no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt."[16]

---

[10] *United States v. Gonzales*, 918 F.2d 1129, 1132 (3d Cir. 1990).

[11] *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

[12] *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) ("[the Court] must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the Court's] judgment for that of the jury").

[13] *United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005). *See also United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010); *United States v. Cunningham*, 517 F.3d 175, 177 (3d Cir. 2008); *United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005); *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002); *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).

[14] *Boria*, 592 F.3d at 486 (Fisher, J., concurring) (citing *United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992)).

[15] *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (citing *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006)).

[16] *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987); *see also Brodie*, 403 F.3d at 134 (In conducting the sufficiency inquiry, a court does "not view the government's evidence in isolation, but rather, in conjunction and as a whole."); *United States v. United States Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) ("The

## B. Federal Rule of Criminal Procedure 33

Under Federal Rule of Criminal Procedure 33, the trial court may grant a new trial when there is a finding of trial error or when the trial court does not believe that the evidence supports the jury's verdict. A motion for new trial pursuant to Rule 33 is directed to the sound discretion of the trial court.[17] Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion for a new trial on the ground that the verdict was contrary to the weight of the evidence, it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.[18] A "district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."[19]

## III. DISCUSSION

### A. Little's and Harmon's Convictions for Conspiracy to Distribute Oxycodone and Alprazolam (Count One)

Both Harmon and Little challenge the sufficiency of the Government's evidence supporting their convictions for conspiracy to distribute oxycodone and alprazolam. To establish a conspiracy in violation of 21 U.S.C. § 846 with respect to each Defendant, the Government must prove that 1) two or more persons agreed to distribute the controlled substances at issue;[20] 2) each Defendant was a party to that agreement; 3) each Defendant joined the agreement

---

character and effect of a conspiracy [is] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (internal citation and quotations omitted).

[17] *United States v. Rottschaefer,* 178 F. App'x 145, 149 (3d Cir. 2006).

[18] *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002); *United States v. Stillis*, No. 04-680-03, 2007 WL 2071899, at *3 (E.D. Pa. July 16, 2007), *aff'd*, 437 F. App'x 78 (3d Cir. 2011).

[19] *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (internal quotations omitted). *See also United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2006) (motions for a new trial based on the weight of evidence "are to be granted sparingly and only in exceptional cases").

[20] The parties stipulated that oxycodone and alprazolam are controlled substances.

knowing of its objective to distribute the controlled substances and intending to join together with at least one other alleged conspirator to achieve that objective.[21]

   1. Sufficiency of Evidence Against Little

  At trial, the Government presented extensive evidence to establish Little's participation in a conspiracy to obtain and distribute oxycodone and alprazolam for distribution.  Patient and pharmacy records indicated that Little personally presented oxycodone prescriptions to pharmacies at least between August 2010 and April 2011.[22]  Herzstein testified (1) that after a conversation with Little, she agreed to schedule appointments for pseudo-patients in exchange for cash payments from Little, (2) that following their agreement, she regularly communicated with Little concerning the scheduling of patients and received cash payments from him as agreed; and (3) that the pseudo-patients were prescribed oxycodone and Xanax, among other drugs.[23]  Alexander and Baldwin each testified that they were recruited by Little to obtain oxycodone and alprazolam as pseudo-patients, and later recruited additional pseudo-patients, drove them to and from Dr. Browne's office and the pharmacies, paid for the appointments and prescriptions using cash provided by Little, and delivered the prescription pills to Little.[24]  Pseudo-patients Frank Norton and Charles McLaurin testified that they were recruited directly by Little from the Raymond Rosen Projects.[25]  Two other pseudo-patients, Latoya Williams and Carla Trippett, testified that they received payments after meetings with Little on occasions when

_____

[21] 21 U.S.C. § 846; Third Circuit Model Criminal Jury Instructions § 6.21.846B.

[22] *See* December 16, 2016 Testimony of Agent Lauriha (Doc. No. 383) at 195, 197-205.

[23] December 2, 2016 Testimony of Heather Herzstein (Doc. No. 373) at 100, 117, 119, 122, 124-25.

[24] Testimony of James Alexander (Doc. No. 374) at 156-57, 178-215; December 7, 2016 Testimony of John Baldwin (Doc. No. 376) at 9-10, 14-20, 23-25, 27-34.

[25] December 13, 2016 Testimony of Frank Norton (Doc. No. 380) at 13-16; December 8, 2018 Testimony of Charles McLaurin (Doc. No. 377) at 191-93.

their drivers failed to pay them what they were owed.[26]   Strand testified that he regularly traveled from Delaware to Philadelphia to purchase oxycodone pills from Little, and that others involved in the conspiracy, including Harmon, Alexander, and Baldwin, were present during many of his transactions with Little.[27]   Alexander and Baldwin also testified that they saw Little sell pills obtained from pseudo-patients to Strand and others.[28]

In asserting that the evidence at trial was insufficient to support his conviction, Little contends that the cooperating Government witnesses—Strand, Herzstein, Alexander, Baldwin, and other pseudo-patients, whose testimony were essential for establishing Little's participation in the pill scheme—were not credible in light of contradictions in their statements, their history of untruthfulness, criminality, and drug addiction, and their motivation to implicate Little based on the potential sentencing incentives created by their cooperation agreements.   Little further contends that the totality of the evidence at trial supports the existence of multiple independent conspiracies led by Herzstein, Alexander, and others, rather than a single conspiracy led by Little.   Neither of these arguments supports a judgment of acquittal or a new trial.

At the outset, credibility is a determination that belongs to the jury, and the Court must presume "that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences."[29]   Here, the Court is not persuaded by Little's assertion that the testimony of the cooperating witnesses was "so incredulous" and "marred by materially false testimony and blatant inconsistencies," that the jury's guilty verdict was "contrary to law" and offensive to "well entrenched standards for justice

---

[26] December 5, 2016 Testimony of Latoya Williams (Doc. No. 374) at 107-09; December 13, 2016 Testimony of Carla Trippett (Doc. No. 380) at 114-16.

[27] December 8, 2016 Testimony of Brendin Strand (Doc. No. 377) at 44-48, 49-50, 87-88.

[28] Alexander Testimony (Doc. No. 374) at 266-270; Baldwin Testimony (Doc. No. 376) at 48-58.

[29] *Coleman,* 811 F.2d at 807.

and fairness."[30]

While Little asserts that "[a]ll of the government's cooperating witnesses proffered information to the government in an attempt to avoid potential draconian sentences," and a majority of these witnesses "violated the terms and conditions of their pre-trial release,"[31] these arguments, and the corresponding impeachment evidence, were fully presented to the jurors, who nonetheless chose to credit the witnesses' testimony. Evidence of the witnesses' past convictions for crimes of dishonesty, false statements, and substance abuse were consistently raised both by the Government on direct examination and by defense counsel during cross examination and closing arguments. During direct examinations of cooperating witnesses, the Government also asked about the witnesses' plea agreements, including their understanding of the Government's option to move the Court for a downward sentencing departure based on substantial assistance. Defense counsel repeatedly argued to the jury that these agreements created an incentive to lie,[32] and the jury was specifically instructed that the testimony of cooperating witnesses should be considered with "great care and caution," and that jurors should assess "whether or not their testimony may have been influenced by the plea agreement or alleged involvement in the crimes charged."[33] In light of the arguments and instructions presented at trial, the histories and potential motivations of the cooperating witnesses do not render reliance on their testimony unreasonable.

Similarly, the specific contradictions and inconsistencies in testimony raised by Little do

---

[30] Little's Supplemental Motion (Doc. No. 404) at 1-2.

[31] *Id*. at 2.

[32] *See, e.g.*, Closing Argument by Little (Doc. No. 385) at 145-46 ("You see . . . it's how the system is built, this whole idea of cooperation. It's like taking a carrot and putting it in front of a horse and leading them down a pathway. What's the horse going to do?"); Closing Argument by Harmon (Doc. No. 386) at 28 ("[R]emember folks, cooperation is like an ATM machine. Right? You put money in the bank. At the time of sentencing you take it out.").

[33] Closing Jury Instructions (Doc. No. 386) at 76.

not warrant disturbing the jury verdict. Little relies heavily on the contradiction between patient records showing visits by Little and other pseudo-patients to Dr. Browne's office at its 111 Presidential Boulevard location and Herzstein's testimony that her arrangement with Little began only after Dr. Browne's office moved to 1 Bala Avenue in September 2010 and Dr. Browne's wife, not Herzstein, was responsible for scheduling any illegitimate patients at the prior location. Little contends that this inconsistency undermines Herzstein's testimony that Little, rather than she herself, directed and coordinated the influx of pseudo-patients to Dr. Browne's office. However, in light of other testimony and record evidence corroborating the existence of an agreement between Herzstein and Little as of July 2010, a jury could reasonably conclude that Herzstein misrepresented or simply misremembered the timing of her initial conversation with Little, while crediting her testimony regarding the substance of their agreement. Cell phone records introduced at trial established that Little and Herzstein first communicated by phone in July of 2010, and patient records from Dr. Browne's office indicate that Little and other pseudo-patients associated with the charged conspiracy began visiting Dr. Browne's office that month.[34] During direct examination, Herzstein acknowledged, after reviewing the patient files, that she first met Little as a patient in Dr. Browne's office prior to September 2010.[35] Other pseudo-patients testified that Little had taken them to appointments at Dr. Browne's office prior to its relocation.[36]

The other inconsistencies raised by Little similarly do not undermine the jury's verdict. Little contends that Herzstein's testimony concerning the financial terms of her agreement with Little is contradicted by her inability during cross examination to explain where the cash

---

[34] December 19, 2016 Testimony of Agent Lauriha (Doc. No. 384) at 17-18.

[35] Herzstein Testimony (Doc. No. 373) at 111-14.

[36] *See, e.g.*, Norton Testimony (Doc. No. 380) at 13-25; McLaurin Testimony (Doc. No. 377) at 225.

payments from Little went.  But a jury could reasonably believe Herzstein's direct testimony that she used the money to pay off her car and other debts, and helped out her mother and her family.[37]  Similarly, while Little asserts that Baldwin's testimony against Little is inconsistent with his prior statements to investigators that he worked for Alexander, a jury could reasonably choose to believe his trial testimony and his explanation that he "didn't want to turn [Little] over" during the initial proffer session because Little was his "friend" and "boss."[38]  Likewise, while Trippett's trial testimony differed from her grand jury testimony regarding how she initially met Little and details concerning how and when she was paid during her meeting with Alexander and Little, a jury could choose to credit her testimony that she met with Little in connection with the pill scheme notwithstanding these discrepancies.

As with Little's challenges to the credibility of cooperating witnesses, his arguments concerning the existence of multiple pill conspiracies were presented to, and rejected by, the jury at trial.  During his opening statement, cross examinations, and closing argument, Little's counsel advanced his theory that Herzstein, Alexander, and other individuals organized multiple conspiracies that operated independently of Little.[39]  While Little continues to maintain that "the totality of the trial evidence and a common sense analysis" supports the conclusion that Herzstein, Alexander, and others "were the primary operators of the pill schemes out of Dr.

---

[37] Herzstein Testimony (Doc. No. 373) at 210.

[38] Baldwin Testimony (Doc. No. 376) at 105-06.

[39] In support of his theory, Little also points to the fact that he, unlike the drivers and pseudo-patients, "was never observed by law enforcement" while "engaging in any activities relating to running a pill operation," interacting with pseudo-patients, or present at or near Dr. Browne's office or the target pharmacies.  Little's Supp. Mot. (Doc. No. 404) at 11.  However, as discussed above, Little's participation in the conspiracy was established through a substantial body of evidence other than direct surveillance, including the testimony of the pseudo-patients and drivers and call logs and recordings of Little's communications with co-conspirators and pseudo-patients. Moreover, Little's absence at Dr. Browne's office and Philly Pharmacy after the DEA began actively monitoring the locations is consistent with evidence that by late 2011, Little had ceased to act as a pseudo-patient himself and had delegated responsibility for the transportation of patients to his drivers.

Brown[e]'s office,"[40] it is not the role of the Court to "re-weigh" the evidence, only to examine whether the jury's verdict was reasonable in the light of that evidence.[41]

At the close of trial, the jurors were specifically instructed that in order to reach a guilty verdict, they must find the existence of the single conspiracy charged in the indictment. The jury was also provided with the factors used to evaluate whether the evidence at trial supports the existence of a single conspiracy rather than multiple independent conspiracies:

> In determining whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies you should consider whether there was a common goal among the alleged conspirators and whether there existed common or similar methods, whether and to what extent alleged participants overlapped in their various dealings, whether and to what extent the activities of the alleged conspirators were related and interdependent, how helpful each alleged co-conspirator's contributions were to the goals of the others, and whether the scheme contemplated a continuing objective that would not be achieved without the ongoing cooperation of the conspirators.[42]

In evaluating whether there was a single conspiracy, the jury had testimony and other evidence that over the span of several years, dozens of pseudo-patients consistently obtained prescriptions from Dr. Browne's office and filled them at one or more of three pharmacies; that Little personally arranged with Herzstein to schedule appointments for these pseudo-patients; that the costs of the doctor's appointments and prescriptions, as well as the payments to Herzstein, the pseudo-patients, and their drivers, were all funded by Little; that the pills obtained by the pseudo-patients were collected and delivered to Little; and that Little sold pills obtained from the scheme to Strand and others in the presence of his drivers Alexander, Baldwin, and Harmon. This, among other evidence presented at trial, was sufficient for the jury to find that Little

---

[40] Little's Supp. Mot. (Doc. No. 404) at 5.

[41] *See United States v. Rich,* 326 F. Supp. 2d 670, 678 (E.D. Pa. 2004) (citing *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992)).

[42] Closing Jury Instructions (Doc. No. 386) at 100-01. *See United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007).

knowingly joined and participated in a single conspiracy to obtain and distribute oxycodone as charged in Count One.

In summary, the verdict must be upheld because a reasonable juror "could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt."[43] Moreover, even when evaluating the Government's evidence in a balanced light under Rule 33, the Court holds that the jury's verdict was not against the weight of the evidence, and there is no serious danger that a miscarriage of justice has occurred.[44] Thus, Little's motion for acquittal or a new trial as to Count One will be denied.

### 2. Sufficiency of Evidence Against Harmon

At trial, in addition to evidence discussed above concerning the existence of a conspiracy to obtain and distribute oxycodone and alprazolam for distribution, the Government introduced additional evidence to support Harmon's participation in the conspiracy. Patient and pharmacy records introduced at trial show that Harmon personally presented oxycodone prescriptions to pharmacies at least between August of 2010 and February of 2011.[45] Herzstein testified (1) that Harmon visited Dr. Browne's office as a pseudo-patient, (2) that he was also one of the drivers who transported other pseudo-patients to the office, and (3) that she sometimes received cash payments from Harmon on behalf of Little.[46] Alexander and Baldwin also testified that Harmon transported patients and pills and handled money for Little.[47] Pseudo-patients Williams and Anthony Minnick testified that Harmon initially recruited them to participate in the scheme,[48]

---

[43] *Coleman*, 811 F.2d at 807 (citation omitted).

[44] *See Davis,* 397 F.3d at 181.

[45] *See* Lauriha Testimony (Doc. No. 383) at 193-194, 206-211.

[46] Herzstein Testimony (Doc. No. 373) at 118, 124-25.

[47] Alexander Testimony (Doc. No. 374) at 218, 240, 263-64; Baldwin Testimony (Doc. No. 376) at 73.

[48] December 7, 2012 Testimony of Kenshara Coleman (Doc. No. 376) at 196-200; Latoya Williams Testimony (Doc. No. 374) at 97-98.

and they along with Kenshara Coleman, Trippett, Frank Norton, Charles McLaurin, and Marvin McLain all testified that Harmon transported them to and from appointments with Dr. Browne during certain periods of the conspiracy.[49] Norton testified that after Herzstein implemented drug testing on patients to confirm that patients were taking their medications, Harmon informed him about the testing and provided him with an oxycodone pill to take in advance.[50] Strand testified that on at least one occasion, Harmon delivered pills to Strand on Little's behalf, and that Harmon was present on multiple occasions when Strand purchased drugs from Little.[51]

In contesting the sufficiency of the evidence to support his conviction, Harmon relies primarily on three arguments. First, Harmon asserts that there is no direct evidence of communications between him and certain other members of the conspiracy during certain periods of time when he was alleged to have actively participated in the conspiracy. Specifically, Harmon alleges that the Government failed to present the following at trial: 1) direct testimony or records of any communications between Harmon and Little between April 2012 until the end of the conspiracy in August 2012, the period of time when Harmon was the primary driver for the pill scheme; 2) records of calls between Harmon and pseudo-patients before each of the appointments scheduled after April 2012; 3) records of any calls between Harmon and Alexander prior to March 3, 2011 or after Harmon's release from jail in December 2011, a period of time during which Alexander testified that he dropped off and picked up cash and pills from Harmon on numerous occasions; 4) records of calls between Harmon and John Baldwin at any time during the conspiracy; and 5) records of calls between Harmon and Strand at any time in the conspiracy.

---

[49] Trippett Testimony (Doc. No. 380) at 107-08; Norton Testimony (Doc. No. 380) at 27-28; McClaurin Testimony (Doc. No. 377) at 200; December 12, 2016 Testimony of Marvin McClain (Doc. No. 379) at 86.

[50] Norton Testimony (Doc. No. 380) at 54.

[51] Strand Testimony (Doc. No. 377) at 44-48, 49-50, 87-88.

The call logs presented by the DEA agent at trial did not purport to constitute a comprehensive set of all communications that took place among the conspirators, and the jury could reasonably rely on additional evidence of Harmon's interactions with others during the periods of time in question. Agent Lauriha testified that the Government only received telephone records for telephone numbers maintained by the telephone providers, and the Government was unable to obtain records for certain numbers.[52] Moreover, after Harmon's release from jail, the Government was unable to identify telephone numbers for him other than the "work phone" previously used by Alexander and a "325" number that was used to contact certain pseudo-patients.[53] Witnesses also testified that Little instructed members of the conspiracy to use "burner phones," which would have been difficult for investigators to identify and track.[54] There was also evidence from which the jury could conclude that additional communications between Harmon and others took place in person. For example, McClain testified that Harmon spoke to pseudo-patients in person to remind them about their appointments.[55] McClain also testified that Harmon came to the Raymond Rosen Projects to tell pseudo-patients that they would start taking cabs to the doctor's office and pharmacy.[56] Several witnesses testified that Harmon traveled with Little and visited his various apartments, providing the two men with ample opportunities to communicate in person. During Harmon's May 29, 2012 recorded call with Alexander, Harmon stated that he had traveled to Miami with Little, and had later received from him the "work phone" previously used by Alexander.[57] After April

---

[52] December 19, 2016 Testimony of Agent Lauriha (Doc. No. 384) at 35, 156-57.

[53] Id. at 158-59.

[54] Herzstein Testimony (Doc. No. 373) at 212; Strand Testimony (Doc. No. 377) at 90-91.

[55] McClain Testimony (Doc. No. 379) at 86.

[56] Id. at 61-62.

[57] Alexander Testimony (Doc. No. 375) at 66-71.

2012, conversations between Little and Harmon would have taken place outside the presence of Baldwin and Alexander, who had both been arrested and detained, and thus neither cooperating witness could have testified to these communications at trial.

Second, Harmon points to inconsistencies in the testimony of several cooperating witnesses concerning his role as a driver. In particular, Harmon asserts that Baheejah Alwan, McClain, Norton, and Herzstein all testified that Harmon had driven or otherwise interacted with them between March 4, 2011 and December 2011, a period of time during which he was incarcerated. However, a reasonable jury is entitled to credit the witnesses' testimony regarding interactions they had with Harmon while not crediting their testimony regarding the dates on which those interactions occurred. This is particularly reasonable given the several years that passed between the interactions at issue and the witnesses' testimony at trial. Moreover, neither Norton nor Herzstein testified that they interacted with Harmon specifically between March and December 2011. Rather, Norton testified that Alexander and Harmon alternated as his driver beginning in about January or February 2011, and Herzstein testified that Alexander and Harmon took over the role of paying her after Little stopped visiting the office as a pseudo-patient around March of 2011. Neither of these statements is directly incongruous with the timing of Harmon's incarceration.

None of the other contradictions asserted by Harmon undermines the reasonableness of the jury verdict:

- Although Herzstein's and Baldwin's testimony were inconsistent as to whether she received an $8,000 payment from Baldwin, and Herzstein's and Alexander's testimony were inconsistent as to whether they had brought their own pseudo-patients to Dr. Browne's office, both disputes are entirely collateral to the witnesses'

testimony concerning Harmon's role in the conspiracy.

- Similarly, Edward Jones's failure during proffer sessions to truthfully identify his girlfriend as the person who recruited him to the pills scheme is not substantively pertinent to his trial testimony that Harmon drove him to doctor's appointments.

- Although McClain admitted during cross examination that he could not accurately recall when Alexander first began driving him to appointments, a reasonable jury could nonetheless credit McClain's testimony that Harmon drove him to appointments before Alexander did.

- While Coleman's grand jury testimony that Harmon was her first driver may be inconsistent with her testimony at trial that Baldwin was her first driver, the discrepancy can be explained by evidence that Harmon drove her to fill a set of forged prescriptions before Baldwin drove her to her first doctor's appointment.[58]

Overall, in light of the multiple witnesses who consistently testified that Harmon transported patients, drugs, and money in support of Leon Little's pill scheme, the specific contradictions raised by Harmon do not undermine the overall sufficiency of the evidence to establish Harmon's role in the conspiracy.[59]

Third, Harmon contends that the Government failed to establish a unity of purpose or intent between Harmon and his conspirators because there was no evidence that Harmon reaped the same financial benefits as others in the conspiracy, including Little, Alexander, Herzstein, and Baldwin. However, the Government is not required to show parity in benefits in order to establish the existence of a common agreement and objective. Rather, as discussed above, there

---

[58] Coleman Testimony (Doc. No. 376) at 204-11.

[59] The additional testimony cited in Harmon's Reply also fails to raise any contradictions that undermine the verdict. Harmon's Reply (Doc. No. 423) at 1-2.

was ample evidence from trial from which a reasonable jury could conclude that Harmon and others joined and participated in a conspiracy with the common objective of acquiring and distributing controlled substances.

Accordingly, the Court concludes that sufficient evidence supports Harmon's conviction for conspiracy to distribute oxycodone and alprazolam, and there is no indication that his conviction was a miscarriage of justice warranting a new trial. Harmon's motion for acquittal or a new trial will be denied.

### B. Little's Conviction for Distribution of Oxycodone (Counts 2-10, 16-30)

Little challenges his conviction for distribution of oxycodone in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) based on insufficiency of the evidence. To establish that Little distributed of oxycodone in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), the Government was required to prove beyond a reasonable doubt that: (1) Defendant distributed a mixture or substance containing a controlled substance; (2) Defendant distributed the controlled substance knowingly or intentionally; and (3) the controlled substance was oxycodone.[60] The Government could also establish Little's guilt through aiding and abetting by proving that 1) another person committed the offenses, 2) Defendant knew that the offenses charged were being committed were going to be committed by the other person, 3) Defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the other person in committing the charged offenses; and 4) Defendant performed an act in furtherance of the offenses charged.[61]

At trial, the Government introduced testimony and records from Northeast Pharmacy, Pharmacy of America, and Philly Pharmacy showing that prescriptions for oxycodone products were filled under Leon Little's name between August 2010 and April 2011 on each of the nine

---

[60] 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Third Circuit Model Criminal Jury Instructions § 6.21.841B.

[61] 18 U.S.C. § 2; Third Circuit Model Criminal Jury Instructions § 7.02.

days alleged in Counts 2-10.[62] A signature for Leon Little appears on the signature logs at Pharmacy of America and Philly Pharmacy for the dates and prescriptions alleged in Counts 3-5 and 7-10,[63] and the Government presented the jury with copies of Little's signature as it appeared on his state-issued photo IDs.[64] The parties stipulated that each of the three pharmacies requested an identification card from patients the first time that they presented a prescription for filling.[65] The evidence also showed that Harmon had 31 controlled substance prescriptions filled at Northeast Pharmacy, Pharmacy of America, and Philly Pharmacy for oxycodone pills between August 9, 2010 and February 25, 2011 on the dates alleged in Counts 16-30.[66]

Little does not present specific arguments challenging the evidence supporting these offenses separate from the arguments presented with respect to his conspiracy conviction. Based on the record evidence of the prescriptions filled by Harmon and Little, and additional evidence that all pills acquired by members of Little's pill scheme were collected by Little for sale to customers, a reasonable jury could conclude Little knowingly distributed the oxycodone pills he obtained in his own name and aided and abetted Harmon in distributing the oxycodone pills obtained in his name. For these reasons, and for the reasons discussed with respect to Count One, Little's motion for acquittal and a new trial will be denied with respect to Counts 2-10 and 16-30.

### C. Little's Conviction for Acquiring Oxycodone by Fraud (Counts 11-15, 31-34)

Little also challenges his conviction for acquiring oxycodone by fraud in violation of 21

---

[62] December 16, 2016 Testimony of Agent Lauriha (Doc. No. 383) at 195, 197-205.

[63] *Id*. at 193-94.

[64] *Id*. at 188-190.

[65] December 13, 2016 Stipulation (Doc. No. 380) at 233-34.

[66] Lauriha Testimony (Doc. No. 383) at 206-11.

U.S.C. § 843(a)(3) based on insufficiency of the evidence. To establish that Little acquired oxycodone by fraud in violation of 21 U.S.C. § 843(a)(3), the Government was required to prove beyond a reasonable doubt that (1) Defendant acquired or obtained possession of a mixture or substance containing a controlled substance; (2) Defendant acquired or obtained the controlled substance by misrepresentation, fraud, forgery, deception or subterfuge; (3) Defendant did so knowingly or intentionally; and (4) the controlled substance was oxycodone.[67] As with the distribution counts, the Government could establish Little's guilt as an accomplice.

At trial, Agent Lauriha testified that 10 of the oxycodone prescriptions filled by Little and 15 of the oxycodone prescriptions filled by Harmon were duplicates of other prescriptions filled at another pharmacy.[68] These duplicate prescriptions had physician signatures that did not correspond with the signature of Dr. Browne on file with DEA, and there were no copies of these prescriptions in Little's or Harmon's patient files.[69] At trial, Heather Herzstein testified that she provided Little and his drivers with unsigned duplicate copies of prescriptions, and that all prescriptions signed by Dr. Browne were placed in the patient files.[70] Moreover, Alexander and Baldwin each testified that Little personally signed duplicate prescriptions and provided them to drivers and patients to fill at pharmacies.[71]

Apart from arguments raised with respect to Count One, Little's only argument regarding the acquisition-by-fraud counts is that the forged prescriptions were signed by Herzstein rather than Little. Specifically, Little relies on testimony from Coleman, Norton and Jones that they

---

[67] 21 U.S.C. § 843(a)(3).

[68] Lauriha Testimony (Doc. No. 372) at 56-59.

[69] *Id*. at 23-34.

[70] Herzstein Testimony (Doc. No. 373) at 133-34, 173-74.

[71] Alexander Testimony (Doc. No. 374) at 220; Baldwin Testimony (Doc. No. 376) at 36-37.

obtained signed duplicate prescriptions directly from Herzstein.[72]  However, jurors were entitled

to reject this testimony in light of competing testimony by Herzstein, Alexander, and Baldwin

that Little signed the forged prescriptions.  Alternatively, jurors could conclude that both

Herzstein and Little had forged prescriptions, and that Little had signed the specific prescriptions

alleged in Counts 11-15 and 31-34, which he and Harmon presented directly to the pharmacy.

Moreover, even if the evidence conclusively established that Herzstein, and not Little, forged all

the prescriptions at issue, a jury could still convict Little on the grounds that he knowingly used

the forged prescriptions to obtain oxycodone.  In light of the fact that the forged prescriptions

were duplicates of others filled on the same day, and contained a version of Dr. Browne's

signature that differed from the signature on the other prescriptions, a jury could reasonably

conclude that Little knew that the prescriptions at issue were forged.  Thus, based on the

evidence presented, a reasonable jury could conclude that Little acquired oxycodone using

prescriptions with a forged signature of Dr. Browne and that he aided and abetted Harmon in

doing with the prescriptions filled in his name.  For these reasons, and with respect to Count

One, Little's motion for acquittal and a new trial will be denied with respect to Counts 11-15,

and 31-34.

### D.  Little's Conviction for an Unlawful Monetary Transaction (Count 35)

Although Little's original motion states that he contests the sufficiency of the evidence

with respect to each count for which he was convicted, his supplemental motion does not present

any arguments directed to his conviction for money laundering in violation of 18 U.S.C. § 1957

under Count 35.  Nevertheless, the evidence at trial was sufficient to support Little's conviction.

To establish a violation of 18 U.S.C. § 1957, the Government was required to prove that (1)

---

[72] Norton Testimony (Doc. No. 380) at 34-35; December 9, 2016 Testimony of Edward Jones (Doc. No. 378) at 244-45; Coleman Testimony (Doc. No. 376) at 250-53.

Defendant engaged in a monetary transaction in or affecting interstate commerce;[73] (2) the monetary transaction involved criminally derived property of a value greater than $10,000; (3) the property was derived from specified unlawful activity; (4) Defendant acted knowingly that is, with knowledge that the transaction involved proceeds of a criminal offense; and (5) the transaction took place in the United States.[74]

At trial, the Government presented video footage of Little, accompanied by others, purchasing a 2010 Can-Am Spyder, a three-wheeled motorcycle, from East Coast Cycle Center in Bensalem, Pennsylvania on March 18, 2011.[75] An East Coast Cycle Center salesman testified that Little purchased the motorcycle in his cousin's name, that part of the transaction was paid with cash ($9,800) and that the remainder was paid with his cousin's bank debit card ($7,748).[76] John Baldwin, who filmed the purchase, testified that Little used his own money to pay for the motorcycle and that he was purchasing the vehicle for his own use.[77] Furthermore, according to Little's tax records, Little had no employment or other source of substantial income other than the pill distribution scheme.

Based on this evidence, and evidence of his participation in the pill scheme, a reasonable jury could conclude that Little purchased the motorcycle using drug proceeds in violation of 18 U.S.C. § 1957. To the extent Little relies broadly on his arguments that he did not participate in the pill scheme, the Court rejects these arguments for the same reasons discussed with respect to

---

[73] The interstate commerce element of § 1957 requires only a minimal effect on interstate commerce, and Courts have held that the transfer of funds drawn from a federal-insured financial institution satisfies this requirement. *United States v. Howard,* No. 99-120, 1999 WL 504561, at *4 (E.D. Pa. July 15, 1999) (citing *United States v. Lovett*, 964 F.2d 1029, 1038 (10th Cir. 1992); *United States v. Kuntzman*, 54 F.3d 1522, 1527 (10th Cir. 1995); *United States v. Peay*, 972 F.2d 71, 74-75 (4th Cir. 1992)).

[74] 18 U.S.C. § 1957.

[75] Baldwin Testimony (Doc. No. 376) at 82-84.

[76] December 13, 2018 Testimony of William Mack (Doc. No. 380) at 250-51.

[77] Baldwin Testimony (Doc. No. 376) at 80-82, 86.

Count One, and Little's Motion will be denied with respect to Count 35.

### E. Little's Conviction for Money Laundering (Counts 36-50)

Little contends that the record was insufficient to prove that he caused or aided and abetted the 15 money laundering transactions alleged in Counts 36-50. To establish money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the Government was required to prove beyond a reasonable doubt that (1) Defendant conducted a financial transaction, which affected interstate commerce; (2) the financial transaction was conducted with the proceeds of a specified unlawful activity, that is, drug trafficking; (3) Defendant knew the transaction involved proceeds of the unlawful activity; and (4) Defendant conducted the financial transaction with knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of drug trafficking.[78] The Government could establish guilt by showing that Little caused another individual to commit, or aided and abetted in committing, the offense.

At trial, Shabazz testified that she and Little jointly planned to accumulate sufficient funds under the name of their jointly owned company, Lemin Consulting, in order to support the start of a UPS franchise, and that as part of that plan, she engaged in a series of financial transactions to move cash generated by Little's pill scheme into Lemin Consulting's account.[79] Specifically, with respect to Counts 36-39, 47-48 and 50, Shabazz testified that she provided her stepmother with $18,000 in cash from Little for depositing into two bank accounts on November 17, 2011, and asked her stepmother to write checks for that amount from these accounts which were then deposited into an account set up for the Chasing Dreams Foundation, a non-profit

---

[78] 18 U.S.C. § 1956(a)(1)(B)(i).

[79] December 14, 2016 Testimony of Aminah Shabazz (Doc. No. 381) at 135-139, 168-173.

organization run by Shabazz and Little.[80]  Records from Beneficial Bank and Citizen's Bank showed that $9,000 in cash was deposited into the stepmother's account at each bank on November 17, 2018.  Records from TD Bank showed that two checks for $9,000 each from Beneficial Bank and Citizen's Bank were deposited into an account for the Chasing Dreams Foundation on November 17, 2018.  Shabazz also testified that after a Thanksgiving turkey drive that she organized with Little, she wrote two checks for $5,040 and $9,000 respectively to her stepmother on November 22, 2011.[81]  Records showed that a $14,000 check from the stepmother's Beneficial Account was subsequently deposited into a Bank of America account held by Lemin Consulting on November 30, 2012.

With respect to Counts 40 and 49, Shabazz further testified that she gave cash that she received from Little to a former colleague and asked the colleague to deposit the cash into his Boeing Helicopter Credit Union Bank account and issue a cashier's check for $27,000 to Lemin Consulting.[82]  The colleague and his bank records confirmed that he deposited close to $27,000 into his account on Shabazz's behalf and issued the requested check to Lemin Consulting,[83] which was subsequently deposited into Lemin Consulting's Bank of America Account on November 22, 2011.  Records of the check and deposits were introduced at trial.

With respect to Counts 41-44 and 46, Shabazz testified that she gave cash obtained from Little to her close friend and asked her to make four cash deposits totaling $40,000 on November 17, 2011 and November 18, 2011.[84]  Shabazz then received the money back in the form of a

---

[80] *Id*. at 178-186.

[81] *Id*. at 184-85.

[82] Shabazz Testimony (Doc. No. 381) at 174-77.

[83] December 14, 2016 Testimony of D. Murphy (Doc. No. 381) at 25-35.

[84] Shabazz Testimony (Doc. No. 381) at 187-90.

check to the Lemin Consulting Bank of America Account.[85]  At trial, the friend confirmed that she made the four cash deposits into two different accounts, and transferred $20,000 from one account into the other, before writing a single check for $40,000 to Lemin Consulting.[86]  Copies of the deposit records and checks were introduced at trial.

In asserting that the evidence at trial is insufficient to sustain his conviction, Little's only argument is that Shabazz's testimony lacks credibility.  Specifically, Little contends that "Aminah Shabazz is a serial liar and obstructer of justice," and points to Shabazz's history of fraud and perjury and her motivation to falsely implicate Little under the terms of her cooperation agreement.  However, as discussed with respect to Count One, the incentives created by cooperation agreements were addressed at length by the Government and Defense counsel throughout the trial, and the jury was specifically instructed regarding appropriate consideration of such in assessing the credibility of cooperating witnesses. Shabazz's history of fraud and dishonesty were also raised repeatedly during both direct and cross examination.  The jury was thus well equipped to evaluate Shabazz's testimony.

Moreover, the existence of the monetary transactions at issue is well corroborated by documentary evidence and the testimony of other witnesses who participated in the transactions. Shabazz's testimony that the transactions were conducted with Little's money, and that Little's money came from illegal drug sales, was corroborated by evidence that she had limited access to other sources of income and Little had no other regular source of funds.  Finally, to the extent Little challenges the credibility of Shabazz's testimony concerning Little's knowledge of the transactions, the jury could reasonably choose to believe Shabazz's potentially self-serving testimony that she and Little jointly planned these transactions as part of their long-term business

---

[85] *Id.* at 189-90.

[86] S. Anderson Testimony (Doc. No. 381) at 65-67.

goals rather than Little's similarly self-serving assertion that he was unaware of what Shabazz was doing with his money.

Accordingly, Little has failed to establish that the evidence at trial was insufficient to support his conviction for money laundering or that the conviction was otherwise against the weight of the evidence. Little's motion will be denied with respect to Counts 36-50.

## IV.     CONCLUSION

For the reasons discussed, the Court holds that the evidence presented at trial is sufficient to sustain Little and Harmon's convictions with respect to Count One and Little's conviction with respect to Counts Two through 50 of the Third Superseding Indictment. The Court also holds that the jury's verdict was not against the weight of the evidence, and that the interest of justice does not warrant a new trial. Defendants' motions pursuant to Federal Rules of Criminal Procedure 29 and 33 will therefore be denied.

An order follows.